# SUPREME JUDICIAL COURT

FOR THE

## COUNTIES OF HAMPSHIRE, FRANKLIN AND HAMPDEN, SEPTEMBER TERM 1839. AT NORTHAMPTON.

——————

PRESENT:

Hon. SAMUEL PUTNAM,  
Hon. SAMUEL S. WILDE,  } JUSTICES.  
Hon. MARCUS MORTON,  
Hon. CHARLES A. DEWEY,

——————

## JOSIAH BARDWELL *et al. versus* DAVID AMES Junior *et al.*

The plaintiff B was originally the owner of a portion of the north shore of Connecticut river and of the bed of the river to the thread of the stream, extending above and below the mills and mill privileges hereafter mentioned. Water power had been created at this place by erecting a pier near the shore and running from it a wing dam into the river, by means of which a portion of the water was turned through guard gates, placed between the pier and the shore, into a reservoir or pond formed by the shore and a side dam parallel thereto, and this pond supplied a stone flume carried down along the shore. In 1826, by an indenture of three parts between the owners of the mills and water power, all the water power became vested in B, the party of the first part, and by the same indenture B grants to C, the party of the second part, the right of drawing and using for the benefit of his oil-mill, or such other mill works or machinery as may be erected or used upon the site thereof, " from the pond and flumes as now erected and in use, so much water as may pass through the following described gateways now used in said oil-mill, or others of equal capacity, (that is, such as will admit water of equal power,) viz. one gateway of one foot and five inches in length and eight and three fourths inches in height, with six feet and three inches head, (to wit, from the top of the flume to the bottom of the gateway ;) another," &c., describing, in the same manner, three

Bardwell
v.
Ames.

more gateways ; and to the plaintiffs, H & L, and others, the party of the third part (which others, as also C, have since transferred their rights to H & L), he grants " the right and privilege of drawing and using for the benefit of a paper-mill or such other mill works or machinery as may be erected or used upon the site thereof, from the pond and flumes as now erected and in use, so much water as may pass through " five gateways (described in manner as above) " now used in said paper-mill, or others of equal capacity "; and B " reserves and retains to himself the right and privilege of drawing and using for the benefit of his mill works and machinery, near said pond, or any other works which may be erected upon the same site, or near the same, from said pond and flumes as now in use, so much water as may pass through " twelve gates, (described in manner as above,) three of them, " or an equivalent, to be drawn from the pond without the stone flume," and nine of them " to be drawn from the stone flume "; and he also reserves and retains " the right and privilege of erecting and maintaining a sufficient flume, not exceeding eight feet in width of channel, to extend from the shore side of the lower end of the stone flume now built, down the river, for the accommodation of any works which may be erected below said paper-mill ; provided however, that the water to be drawn and used through said eight feet flume shall not exceed in quantity, but may be equal to, that which the party of the third part are entitled to by this indenture. And it is mutually agreed, that the dam, pier, guard gates, stone flume and the general passage of the water into said flume, shall be and remain situated as they now are forever, unless altered by mutual consent of all parties, and to be occupied in common for the purpose of obtaining water and making repairs, without hindrance or interruption from any party. And if there is at any time a deficiency of water, the parties shall respectively be entitled to draw the same only in proportion to the rights and interests above expressed ; and in case there is a surplus, they shall all be entitled to use the same ratio or proportion. And it is mutually agreed by the parties, that they and each of them, are to contribute towards the expenses of maintaining and repairing the dam, pier, guard gates, and other works for keeping up and supporting said pond, (exclusive of stone flume,) in proportion to the water power which they respectively derive therefrom, the proportions to be determined by the capacities of the gateways, it being agreed that the party of the first part is not to contribute any thing towards said expenses on account of his right or privilege of drawing and using water from said stone flume below the said paper mill, until he actually sells or makes use of the same, unless," &c. In 1831, B conveys to the defendants a parcel of his land bounded on the river and going to the thread of the stream, (in which were situated the wing dam, pier, guard gates, side dam, upper end of the stone flume and the upper mill site ; " also the right and privilege of drawing and using for the benefit of a paper-mill, or such other mill works or machinery as may be erected or used upon the above granted premises, so much water from the mill pond on said river upon and above the premises, as is equal to the quantity and power to which " H & L, &c. are entitled by virtue of the indenture of 1826, " a part of such water, not exceeding one half, to be drawn from the stone flume, and the residue thereof from the pond above said flume. This grant of privilege of drawing and using water as above, is on condition that the defendants shall contribute towards the expense of maintaining and repairing the dam, pier, guard gates, &c. in proportion, &c. And on condition that said dam, pier, guard gates, stone flume, and the general passage for water into said flume, shall be and remain situated as they now are, forever, unless altered by consent of all parties interested "; " making, however, from said sale and grants the following reservations, to wit, I reserve to myself, &c. the right and privilege of drawing and using from said pond over or across the granted premises, by

means of said stone flume, the quantity of water or power which I now draw for the use of my grist-mill, and clothier's shop, and carding machine, and for my privilege below H & L's paper-mill," &c. The defendants erected a paper-mill on the mill site granted to them, and built a penstock below the wing dam, in order to increase the supply of water for their works, by which penstock the water was thrown back upon the wing dam; they also built a wall in the river south of their mill, which was extended down the river by the plaintiffs, and thereby a raceway was made by which the water from the mills, instead of being immediately diffused in the river, passed into it at a place below all the mills.

It was *held,* that the subject matter of the indenture was the whole of the water power created by the artificial works erected for the purpose of applying the stream to mill purposes, consisting of the wing dam, pier, guard gates, side dam and stone flume; and that all the rights of the parties to the indenture, in all the water privilege which was or could be derived by any mode of using these works, depended upon the indenture ; but that any rights which B had, as riparian proprietor, in the unoccupied portion of the river, so far as they could exist and be used without impairing the conventional rights granted by the indenture, remained to him unaffected by the indenture.

*Held* also, that the indenture effected a distribution of the entire water power created by the artificial works, not by a grant or reservation of a specific quantity of water power as measured by the gateways, but by fixing the proportion in which all the parties should use the water power, whether it should exceed or fall short of the aggregate of all the powers particularly specified.

*Held* also, the parties were not restricted by the indenture to the use of the gateways then existing, but that they might respectively change the places of their gates by making new openings into the pond and stone flume, provided they did not weaken or otherwise injure these common works, and that this would not be an alteration in these works, within the meaning of the indenture.

*Held* also, that under the grant to the defendants of the right of drawing so much water as is equal to the quantity and power to which H & L, &c. are entitled by virtue of the indenture, the measure of the water to be drawn by the defendants was the dimensions of the gateways and head of water, without regard to the greater or less fall from the gateways to the bottom of the raceway.

*Held* also, that as against B, the defendants had a right to draw any part of the water granted to them, not exceeding one half, from the stone flume and the residue from the pond; but that as by the indenture B himself was allowed to draw from the pond only a certain quantity of water, (determined by three gates therein specified,) so as against H & L, &c. the defendants could not draw more than that quantity from the pond.

*Held* also, that if the defendants opened gateways in their mill capable, in their ordinary action, of drawing a much larger quantity of water from the common reservoir than the defendants were entitled to draw, especially if their gateways were withdrawn from observation, equity would award an injunction compelling them permanently to close a portion of their gateways, leaving such only as would enable them to draw the quantity to which they are entitled ; or, if the defendants' works were of such a character as to require the alternate action of particular gates, so that when one was open a corresponding one would be closed, then, in order to obtain the right of making a greater capacity of gates than it was intended to use at any one time, it would be incumbent on the defendants to set out such special case, and to give a pledge or security, adapted to the case, so as effectually to protect the rights of the other parties.

*Held* also, that the defendants, as riparian proprietors under the grant from B, ac-

quired a right in the stream without and beyond the wing dam and other artificial works of the proprietors of the mills, and, as such riparian proprietors, might erect any works and make any use of the stream which could be done without interfering with the common works of the proprietors of the mills, but that they had no right to alter those common works ; and that the erection of the penstock higher than the wing dam, so as to throw back the water upon that dam, was an alteration of the common works, and if it caused damage to the plaintiffs, they were entitled to relief.

*Held* also, that the distribution by the indenture, of the mill power created by the common works erected at the time, extended to the enjoyment of the raceway then in use for conducting the water from the mills, and that thenceforth neither party could do any act to render this raceway less beneficial to the other parties ; that the defendants had a right to build the wall, on their own land, on the southerly side of their mill, to keep out the waste water of the river, provided it did not injure or impair the rights of the plaintiffs ; and the plaintiffs had a right to continue this wall down the river, if it did not prejudice the defendants ; and, (supposing the wall to be injurious to neither party,) that thenceforth the space between the wall and the shore became the common raceway of the parties, to be used in connexion with their respective water rights as settled by the indenture.

*Held* also, that if the plaintiffs, by their wall, narrowed the raceway, this would not justify the defendants in drawing from their penstock into their mill, and thence into the raceway, a quantity of water in addition to that which was or could be drawn from the common reservoir, and thereby impeding the plaintiffs' wheels ; not even if the defendants had, by their wall, kept from the plaintiffs' wheels as large a quantity of back water as the penstock was calculated to throw upon them.

The plaintiffs' bill in equity alleged, that the defendants were entitled to draw from the common reservoir, 12,335 cubic feet per minute, but that they were erecting works which would require, and that they threatened to use, a much larger quantity ; and it prayed for damages and for an injunction to restrain them from using more than 12,335 cubic feet per minute. The defendants' answer claimed a right to use more than 12,335 cubic feet per minute, but denied that they had used, or intended to use, more than they were entitled to ; and it did not appear that they had drawn so much as 12,335 cubic feet per minute. It was *held*, that even if the defendants were not entitled to draw so much as that quantity and had in fact drawn more than they were entitled to, yet that under this issue the plaintiffs could not recover damages against them for having drawn too great a quantity, and that an injunction would not lie to restrain them from drawing 12,335 cubic feet per minute.

BILL in equity, commenced in 1832, by Josiah Bardwell, Charles Howard and Wells Lathrop, plaintiffs, against David Ames junior and John Ames, defendants.

The bill sets out, that on the 26th of July, 1826, the plaintiffs, with Enoch Chapin and wife, David W. Willard and Eli Stephenson, were the owners of various mills and mill sites in South Hadley, near the entrance of the South Hadley canal into Connecticut river, which mills were supplied with water from the river, by means of dams, gates, flumes and other works, as designated on a plan referred to.

By a plan subsequently taken, it appears, that the course of the river at this place is from west to east. The South Hadley canal is on the north bank and nearly parallel with the river, and the mills are situated between the canal and the river. Above the mills and several feet from the bank, is a stone pier, between which and the bank are guard gates ; and running from the pier in a southwesterly direction, is a wing dam, which turns a portion of the river through the guard gates into a reservoir between the bank and a side dam, which serves for the general passage of the water into a stone flume, nearly parallel with the canal. The upper or most westerly mill is a paper-mill belonging to the defendants, built on a saw-mill site owned in 1826 by Bardwell and conveyed by him to the defendants in 1831 ; next in order are the grist-mill, clothier's shop and carding machine of Bardwell ; next, Howard & Lathrop's new paper-mill, on the site of Chapin's oil-mill ; and last, Howard and Lathrop's old paper-mill.

The bill then sets forth, that Bardwell, Howard, Lathrop, Chapin and his wife, Willard and Stephenson, for the purpose of more accurately defining their respective rights and securing to themselves the uninterrupted enjoyment of them, entered into a certain indenture, bearing date the 26th of July, 1826, a copy of which is annexed to the bill. This indenture is between Bardwell of the first part, Chapin and his wife of the second part, and Lathrop, Stephenson, Howard and Willard of the third part. The parties of the second and third parts release respectively to Bardwell, " all the right and privilege of drawing and using water for the benefit of an oil-mill or other works from the mill pond above Bardwell's saw-mill, as conveyed by deed from said Bardwell to Jonathan Newell, and now owned by said party of the second part, and all the right and privilege of taking and using water, in common with the other owners, from said mill pond, as granted by said Bardwell to Oliver Chapin and Eli Stephenson, by his deed dated the 28th day of August, 1824, and now owned by the said party of the third part." And instead of the above released rights and privileges, Bardwell grants to Enoch Chapin and his wife " the right and privilege of drawing and using, for the benefit of the oil-mill, or such other mill works or machinery, as may

be erected or used upon the site thereof, from the pond and flumes as now erected and in use, so much water as may pass through the following described gateways now used in said oil-mill, or others of equal capacity,. (that is, such as will admit water of equal power ;) viz. one gateway of one foot and five inches in length, and eight and three fourths inches in height, with six feet and three inches head, (to wit, from the top of the flume to the bottom of the gateway ; ) another," &c. (describing three other gateways, in the same manner, by the dimensions and head of water.) "And instead of the right and privilege above released," Bardwell grants to the party of the third part, "the right and privilege of drawing and using for the benefit of a paper-mill, or such other mill works or machinery as may be erected or used upon the site thereof, from the pond and flumes, as now erected and in use, so much water as may pass through the following described gateways now used in said paper-mill, or others of equal capacity, viz. four gateways, each one foot and seven and a half inches in length, and one foot and five inches in height with six feet and eight inches head, and one other of one foot two inches in length and nine inches in height, with four feet and nine inches head." And Bardwell "reserves and retains" to himself, "the right and privilege of drawing and using for the benefit of his mill works and machinery near said pond, or any other works which may be erected upon the same site, or near the same, from said pond and flumes as now in use, so much water as may pass through the following described gateways now in use by said party on the premises, or others of equal capacity, viz." &c. (describing three gateways by dimensions and head of water,) "these three or an equivalent, to be drawn from the pond without the stone flume. Also the following, to be drawn from the stone flume, viz." &c. (describing nine gateways by the dimensions and head of water.) "And also reserving and retaining the right and privilege of erecting and maintaining a sufficient flume, not exceeding eight feet in width of channel, &c. to extend from the shore side of the lower end of the stone flume now built, down the river, for the accommodation of any works which may be erected below said paper-mill, the bottom thereof, at the upper end, to be upon a level with the bottom

of said stone flume, and thereby drawing so much water as the flume will contain, from said stone flume, for the use of such works below ; provided, however, that the water to be drawn out and used through said eight feet flume, shall not exceed in quantity, but may be equal to, that which the said party of the third part are entitled to, by this indenture. And it is mutually agreed by the parties to this indenture, that the dam, pier, guard gates, stone flume, and the general passage for the water into said flume, shall be and remain situated as they now are, forever, unless altered by mutual consent of all parties, and to be occupied in common for the purpose of obtaining water and making repairs, without hinderance or interruption from any party. And if there is at any time a deficiency of water, the parties shall respectively be entitled to draw the same only in proportion to the rights and interest above expressed ; and in case there is a surplus, they shall all be entitled to use the same ratio or proportion. And further it is mutually agreed by the said parties, that they, and each of them, their heirs and assigns, are to contribute towards the expenses of maintaining and repairing the said dam, pier, guard gates, and other works for keeping up and supporting said pond, and of removing rubbish and obstructions from the same, (exclusive of stone flume,) in proportion to the water power which they respectively derive therefrom, the proportions to be determined by the capacities of the gateways." Provision is then made for ascertaining by arbitration the proportion in which the parties shall contribute toward the support and repairs of the stone flume ; " the lesser flumes, or passages which conduct water therefrom to the wheels of the several establishments, are to be supported by the respective owners of the wheels. And we the said parties hereby mutually covenant with each other, that we will, and hereby do, permit and suffer all and every thing in and by the foregoing, on our parts mutually and respectively to be done, permitted or suffered."

The bill then alleges, that subsequently to the execution of the indenture, Howard and Lathrop became, and now are, the owners of all the interest of Chapin and wife, Willard and Stephenson, in the premises.

The bill further alleges, that on or about the 1st of August,

1831, Bardwell made a deed to the defendants, a copy of which is annexed to the bill. By this deed he conveyed to them " a tract of land described and bounded as follows, viz. Beginning on the south line of land of the Proprietors of the Locks and Canals on Connecticut river, near the south side of the locks, at a point four feet westerly of the line of the west end of my grist-mill produced northerly to said proprietors' land ; thence extending along the said proprietors' line on the south side of the locks, and bounding northerly on the said proprietors' land about sixteen rods to near the top of the hill, opposite an elm tree marked, — thence southerly at right angles with the line of the canal there to said elm tree and thence the same point to Connecticut river, — thence on said river easterly, to a line parallel with the line of the west end of said grist-mill, drawn southerly from the first mentioned point, — thence northerly by said line parallel with the west end of said grist-mill, and four feet west thereof, crossing the stone flume at a place marked on the north side of it, to the first mentioned point or station ; " — " also the right and privilege of drawing and using for the benefit of a paper-mill, or such other mill works or machinery as may be erected or used upon the above-granted premises, so much water from the mill pond on said river upon and above the premises as is equal to the quantity and power to which Wells Lathrop, Eli Stephenson, Charles Howard and Daniel W. Willard, or their assigns, are entitled by virtue of a conveyance from me to them dated " &c. (the indenture of July 26th, 1826,) " and any other conveyance from me to said Lathrop, Stephenson, Howard and Willard, or their assigns, a part of such water, not exceeding one half, to be drawn from the stone flume, and the residue thereof from the pond above said flume. This grant of privilege of drawing and using water as above, is on condition that the said David junior and John, their heirs and assigns forever, shall contribute towards the expense of maintaining and repairing the dam, pier, guard gates and other works, for keeping up and supporting said pond, and of removing rubbish and obstructions from the same, in proportion to the water power which they derive therefrom, compared with those of other owners thereof, and towards the expense of maintaining and repairing said stone

flume in proportion to the water power they shall derive therefrom, compared with those of others drawing water from that flume, and on condition that said dam, pier, guard gates, stone flume, and the general passage for water into said flume, shall be and remain situated as they now are, forever, unless altered by consent of all parties interested, that the passage for the water to the stone flume shall not be made in any way or part, less than seventeen feet wide, nor be in any way more obstructed than it now is, and that all persons having right to draw water from said pond, shall retain and have in common with said grantees, the right and privilege of entering upon and occupying the granted premises, so far as may be necessary for the purpose of repairing or rebuilding said dam, pier, guard gates, stone flume, and the other works connected therewith, and of removing obstructions and rubbish from said pond and flume, and so far as is necessary for a proper enjoyment of their privileges." — " Making, however, from said sale and grants, the following reservations, to wit : — 1. I reserve to myself, my heirs and assigns, forever, the right and privilege of drawing and using from said pond over or across the granted premises, by means of said stone flume, or any other to be erected on its place, the quantity of water or power which I now draw for the use of my grist-mill and clothiers' shop and carding machine, and for my privilege below Howard & Lathrop's paper mill, on contributing my proportion towards repairs, as expressed in an indenture," &c. (the one before mentioned.) " 2. I reserve to said Proprietors of the Locks and Canals all the reservations in the premises made in their deed of the same to me, dated September 1, 1806 ; and also to Enoch Chapin and wife and to Howard & Lathrop, all the rights and privileges granted to them in the premises, in and by the indenture aforesaid."

The bill further alleges, that by virtue of the deeds before mentioned, the several parties had and still have a right to have the dam, pier, guard gates, stone flume, and the general passage of the water into the flume, remain as they then were, forever, unless altered by mutual consent of all parties ; and that no person or party, without the consent of the other parties to the indenture, could enlarge or change any of the openings from the works so maintained by the parties at their joint

expense, into the flumes or passages, and for the purpose of letting water upon the wheels of the respective parties, nor could any person, without the like consent, occupy or use more water than is secured to him by virtue of the deeds, nor could they, without such consent, in any way injure, impair or alter these general works, so owned and repaired in common.

The bill further states, that the quantity of water power to which the defendants are entitled by their deed from Bardwell, is equivalent to the discharge of 12,335 cubic feet by the minute or thereabouts, and that this power, when applied to the purpose of manufacturing paper, would only be capable of carrying six engines, of the power and capacity of 120 pounds each, or thereabouts.

The bill then charges, that the defen.'ants, in disregard of the rights of the plaintiffs, have proceeded to erect, and are now in the process of erecting, upon the land granted to them, buildings, flumes, gates, wheels, and other works, fitted and designed to operate in a paper manufactory, twelve engines, of the power and capacity of 150 pounds each, or thereabouts, and the same cannot be put into operation without a water power capable of discharging 31,000 cubic feet by the minute or thereabouts, and that the defendants, for the purpose of bringing such power into operation, have erected in and upon the flumes or passages constructed by them for the purpose of letting in water upon their wheels, twelve gates or thereabouts, which are capable of discharging 31,000 cubic feet by the minute or thereabouts. And that for the further purpose of carrying on their works so erected and erecting, the defendants, without the consent of the plaintiffs, have cut down and removed fifteen feet, or thereabouts, of the dam, which by the indenture and deed it was covenanted should remain as it was at the date of the indenture unl'ss altered by consent of parties, and that the defendants, in the breach so made, and in openings made in other places in the works owned in common, have placed gates by which they can at their pleasure draw from the general reservoir of the water, so owned in common, sufficient water to discharge upon their wheels 31,000 cubic feet by the minute ; that the defendants threaten to remove other parts of the dam and works agreed to be kept permanent ; that th*

plaint ffs believe it is the intention of the defendants, whenever their works shall be completed, to put them into full operation, and that such a course would greatly injure, if not nearly destroy, the value of their property above described ; that there is not commonly more water contained in and flowing into the common reservoir, than is necessary, in order to allow to each party the quantity to which he is entitled by the indenture and deed, and that the whole quantity allowed to all the works, (exclusive of the lower privilege of Bardwell, which has never yet been occupied,) bears to the quantity requisite to carry the works erected and erecting by the defendants, but the proportion of 37 to 31, or thereabouts, and that the use of such a quantity by the defendants will not only deprive the plaintiffs of a sufficient quantity for working their own mills, but will pass such large quantities down the raceway by and upon the wheels of the plaintiffs, as thereby to prevent or materially obstruct their operations ; that the plaintiffs have been informed and believe, that the defendants threaten and intend to bring from the river a large quantity of water into the flumes and passages so occupied by them, for the purpose of passing water upon their wheels, so constructed as before mentioned, in order to operate them when a sufficient quantity cannot be obtained from the general reservoir ; and that if this should be done, the quantity of water which would then pass down the raceway and would be thus accumulated upon the plaintiffs' wheels, would render their operation nearly or quite impracticable for any useful purpose.

The plaintiffs pray that the damages which may have been or may hereafter be incurred in consequence or by means of these unlawful acts of the defendants, may be paid to the plaintiffs, or such of them as may be entitled to the same ; and that in the mean time the defendants may be enjoined from making any alterations in or committing any injury to the works so owned and occupied in common ; and that they may be further enjoined to restore the works so removed, to the state in which they were previously to the injury, to abstain from drawing or using any more water from the common reservoir than they are entitled to by virtue of their deed from Bardwell, and to keep, at all times, their gates closed, except so many of them as may

Bardwell
*v.*
Ames.

be necessary for the purpose of drawing the quantity of water to which they are so entitled, and to desist from turning into the raceway, above the plaintiffs' works, any more water than they have a right to pass by and along the same by virtue of the grants to them.    The plaintiffs further pray for general relief.

The defendants, in their answer, admit the execution of the indenture and other deeds mentioned in the bill, and that the grant to them of the privilege of drawing and using water was upon certain conditions or limitations, and they say that they have not, to their knowledge, broken or infringed those conditions or limitations ; they admit that the plaintiffs have a right to have, for all beneficial purposes, the dam, pier, guard gates, stone flume, and the general passage for the water into that flume, remain situated forever as they were, unless altered by mutual consent of all parties, but they deny the allegation that no person or party, without the consent of the other parties to the indenture, could enlarge or change any of the openings from those works into the flumes or passages, for the purpose of letting water upon the wheels of the respective parties, in the broad unqualified sense in which it is made, and they say that they have a right, upon the land conveyed to them, without consulting other parties, to enlarge or change the openings from those works into the flumes or passages, for the purpose of letting water upon their wheels, so far as is necessary for a beneficial enjoyment of their property, provided they thereby draw no more water than they have a right to, and occasion thereby no actual damage to the plaintiffs.

The defendants deny that the quantity of water power to which they are entitled is equivalent only to the discharge of 12,335 feet of water by the minute, and that the power to which they are entitled would, when applied to the manufacture of paper, be only capable of carrying six engines of the power and capacity of 120 pounds each ; and on the contrary they allege, that they are at least entitled to so much water power as is equal to the quantity and power to which Howard & Lathrop and Willard and Stephenson were entitled by the indenture, or any other conveyance from Bardwell to them ; that by the indenture Howard & Lathrop, &c. were entitled to draw so much water as would pass through certain gateways, (de-

scribing them as in the indenture,) or others of equal capacity; that Howard & Lathrop, &c. drew a part of their water from the stone flume into their separate flumes and applied the water to their wheels at a considerable distance from the stone flume, in such a manner as to obtain an additional fall from the head of the gateways to the bottom of the wheels, of three feet and ten inches or thereabouts; and that the capacities of their gateways were measured at the outlets from the separate flumes upon the wheels; and further, that Howard & Lathrop, &c. were entitled to a proportional part of the surplus water, and also of that reserved by Bardwell for his lower mill site until the same should be applied by Bardwell, as provided in the indenture.

The defendants admit, that they have nearly completed, upon the land conveyed to them by Bardwell, buildings, flumes, gates, wheels and other works fitted and designed to operate in a paper manufactory twelve engines, the vats of which are sufficient to contain from 120 to 150 pounds of stuff each, but they deny the allegation, that the same cannot be put into operation without a water power capable of discharging 31,000 cubic feet by the minute.

They also deny, that the twelve gates, which they have erected, are capable, with the head which they have, of discharging 31,000 cubic feet by the minute; and they further deny that they have ever discharged or applied, or ever intended to discharge or apply, that quantity of water from the pond, by means of those gates, upon their wheels, or any greater quantity or power than they are entitled to by virtue of the conveyance from Bardwell to them, or that they have done any thing on the premises in violation of their duty or disregard of the rights of the plaintiffs.

The defendants admit, that for the purpose of prudently conducting the quantity of water to which they are entitled, from the pond to their flumes and wheels, in order to the proper and beneficial enjoyment of their property, they have carefully removed about fifteen feet of the upper part of the old log dam situated upon their own land, which supported a part of the pond, and which had become partially decayed and defective, and have repaired the same by erecting in the place thereof

large and strong posts, frame work and planking, firmly sup
ported by their mill, and have placed gates therein extending
downwards to a sill about six inches above the bottom of an
old saw mill flume in use before the conveyance to the defend-
ants, situated a few feet northerly of the gates, and have also
removed the old saw mill flume which was below the dam and
was decayed and useless, and closed up the opening through
which the water passed out from the pond into that flume, by
good and permanent frame work and planking, thereby chang-
ing the opening for the passage of water upon their own ground
from the pond to their separate flume, but making the same less
than the opening at the saw mill flume, and the parts of the
dam and frame work connected therewith for supporting the
pond, more firm, tight and durable, and more favorable for
conducting water to the stone flume and the plaintiffs' mills,
than before the conveyance to the defendants.

The defendants also admit, that they have made two other
small openings from the general passage, for the purpose of
regulating the admission of water from the pond into their sep-
arate flume and keeping up the head therein, and have placed
gates in the same ; but they deny that by all these openings
and gates they can draw from the general reservoir or pond
sufficient water to discharge upon their wheels 31,000 cubic
feet of water by the minute.   And they thereupon say, that
they have never drawn from nor intended to draw from the
general reservoir, by means of these openings and gates, any
more water, or water power, than they are justly and lawfully
entitled to draw therefrom ; that these openings are not, in
the aggregate, so great as those used by Howard & Lathrop
for the purpose of obtaining and applying the water power to
which they, with Willard and Stephenson, were entitled by
the indenture, nor greater than are necessary to enable the de-
fendants to obtain from the reservoir and apply usefully in their
paper-mill, the quantity of water and water power to which
they are entitled.   They also say, that the head and fall at
their wheels being much less than at those of Howard & Lath-
rop, they require larger gateways, or a greater number, to ob-
tain an equal power, that the head and fall at their wheels are

but seven feet and nine inches, and at Howard & Lathrop's they are ten feet and six inches.

They admit that there is not commonly, nor at any time, more water contained in or flowing into the common reservoir, than is necessary in order to allow each party the quantity to which he is entitled under the indenture and the deed to the defendants, because they think that provision is made by those instruments for a full and fair distribution and use of all that water at all times among the parties ; but they deny that the whole quantity of water allowed to all the works (exclusive of the lower privilege of Bardwell) bears to the quantity requisite to carry the works erected and erecting by the defendants but about the proportion of thirty-seven to thirty-one, and they allege, that the whole quantity of water power which they claim a right to draw from the reservoir and apply to their use in the premises, bears to that allowed to all the other works (exclusive of Bardwell's lower privilege) but about the proportion of one to two. And the defendants deny that the occupation and use of such a quantity of water by them, will deprive the plaintiffs of any water or water power to which they have a just right, or pass such large quantity of water down the raceway by or upon any wheels of the plaintiffs which were erected and in use at the time of the conveyance from Bardwell to the defendants, or up to the time when the defendants laid out the arrangements and foundation of their paper-mill and commenced the erection thereof, as thereby to prevent or materially to obstruct their operation.

And thereupon the defendants say, that they are advised by practical mechanics and believe, that by reason of the superior construction and arrangement of their engines and other machinery, they can, by means of a water power equal to that which can commonly be discharged and applied by and through the five gateways of Howard & Lathrop, at all times keep nine, at least, of the defendants' engines in operation and use, and that by means of their proportion of the surplus water and of their proportion of the water reserved by Bardwell for the benefit of his lower privilege, to which they are entitled till applied to that use, they can rightfully keep their three remaining

Bardwell
*v.*
Ames.

engines, and the other smaller works of their paper-mill, in cp-eration during most or all of the time.

They admit that since the filing of the plaintiffs' bill, they have been induced by the plaintiffs' threats and opposition to the rightful and beneficial enjoyment by the defendants, of their property and water privilege, to adopt a plan for obtaining water from the river for the benefit of their paper-mill, in case it shall become necessary, independent of the general reservoir, and have erected upon their own land, below and without the reservoir, certain works for the purpose of bringing from the river upon their own land below and without the reservoir, so much water as may be necessary to keep their works in convenient operation, if there should be at any time a deficiency in the quantity to which they are entitled from the reservoir, and at such times when it becomes necessary, as it often will, to shut out the water at the guard gates for the purpose of repairing the mills and works below. But they deny that thereby the quantity of water which will pass down the raceway, will, by any fault or doings of the defendants, be accumulated upon any wheels of the plaintiffs' rightfully there situated, so as to impede or in any way injure their operations. They also deny that any greater quartity of water will thereby be turned into the raceway than had always been accustomed to run therein ; and they deny that other than as above, they have ever threatened or intended to bring from the river any water into their flumes or passages. They allege, that the raceway, at the time when Bardwell's conveyance to the defendants was made and up to the time when they laid the foundation of and commenced building their mill, was along the back side of the plaintiffs' mills, in the river, which is there nearly half a mile in width, and no way separated therefrom ; that Bardwell was then the owner of the land in the raceway and river down to the lower end of the mill site then owned by Chapin and wife ; that the water theretofore used and discharged by Bardwell upon the premises now owned by the defendants, together with the water passing over the dam and the other water in the river tending in that direction, without obstruction, always freely passed off from the land now owned by the defendants, in and by the raceway, and therein mingled with and diffused itself in the river,

so that the water in the raceway was always upon a level with that in the corresponding parts of the river; that it is incident to the defendants' estate in the premises, and among the privileges and appurtenances conveyed to them by Bardwell, and they have a right, to have that water pass off from their premises and diffuse itself in the raceway and river, in as large quantity and in the same way that it did at the time of, and from time immemorial before, the conveyance to them; that at the time of the conveyance and at the commencement of the erection of their mill, the plaintiffs' wheels, then and before in use. were, by their elevated situation, and by means of a substantial wall of stone, and frame and plank work under and along the sides of their mills, adjoining the raceway and river, in a great measure protected from and against the water therein, except at high water, when the river would set back upon them from below; and the water applied to the wheels of Bardwell's gristmill (with the exception of one small wheel) and that applied in Howard & Lathrop's paper-mill, was mostly discharged by passages under those mills into the river below Howard & Lathrop's paper-mill. They further say, that immediately after the conveyance to them, they erected along the end of their mill next the river, a solid wall of mason work, about seventy feet in length, extending from the side dam below the guard gates, to the lower side of the defendants' premises, thereby defending the works below and shutting out and turning away further into the river, a quantity of waste water, which used to pass over a part of the ground now occupied by the defendants' mills into and down the raceway, greater than that which will be requisite, in addition to such quantity as Bardwell formerly used at his saw-mill on the premises, to keep the defendants' wheels and works in full operation; so that when their mill shall be finished, it can be put into complete operation, and no more water will thereby pass over and from the ground whereon the same stands, into the raceway, than always passed there at similar height of water in the river, when the saw-mill was in use by Bardwell, and for more than forty years before the filing of the bill.

But the defendants further allege, that if any damage shall result to the plaintiffs from the passing of such quantity of

water down the raceway as may be necessary for the operation of the defendants' paper-mill, it will be in consequence of the imprudent and wrongful acts of the plaintiffs themselves ; and they thereupon say, that the plaintiffs, since the erection of the defendants' wall, have built a solid wall and a mound of earth and stones extending from the lower end of the defendants' wall down the river to the middle of Howard and Lathrop's old paper-mill, thereby separating the raceway from the river and narrowing it, shutting in and preventing the water passing therein from the defendants' premises and elsewhere, from diffusing itself in the river as formerly, and turning the same water more in towards and upon the plaintiffs' mills ; and that the plaintiffs have made alterations in their respective mills, and placed obstructions in the raceway, (which alterations and obstructions are specified in the answer,) and which the defendants say very much obstruct the passage of water from their premises, and will impede the operation of their wheels, and are in contravention of their rights.

The defendants deny that any works held in common by the parties have been destroyed by the defendants ; they deny that any thing is due from them to the plaintiffs or either of them, and that any damages have been incurred, or are likely to be incurred, by the plaintiffs in consequence of any unlawful acts of the defendants in the premises.

The plaintiff filed a replication.

At September term 1834, the case was referred to a master in chancery ; who subsequently made his report.

Among other things, the master reported the capacity of the gateways specified in the indenture to be as follows :

The five gateways of Lathrop and others in cubic feet per minute . . . . . . 8,192
The four gateways of Chapin and wife . . 3,321
The three gateways of Bardwell, drawn from the pond . 4,441
The nine gateways from the stone flume . . 8,776
Bardwell's reservation of a lower privilege, not yet occupied 8,192

Rights of all the parties, exclusive of surplus water as limited by the indenture . . . . 32,922

He further reported, that until Bardwell shall occupy his lower privilege, and when the water is at the head fixed by the

indenture, the parties to this suit are entitled to keep open gates of a capacity sufficient to draw the following quantities of water in cubic feet per minute, viz. Howard & Lathrop are entitled to draw on the site of their old paper-mill, 8,192 cubic feet, and on the site of the oil-mill, 3,321 ; Bardwell is entitled to draw from the stone flume, 8,776 ; and the defendants are entitled to draw from the pond, 4,441 ; and as against Bardwell, but not as against Howard & Lathrop, the defendants have a right to draw a part of their water, not exceeding half, from the stone flume, and the residue from the pond. He also reported, that in general there would be no surplus of water, but on the contrary, a deficiency, that is to say, that when the several mills were in operation, the water in the stone flume would be drawn below the head contemplated by the indenture.

The master further reported, that the defendant's dam and penstock were erected in 1832. They are placed wholly upon the land of the defendants, and are so constructed below and joined to the wing dam, as to intercept a portion of the water which flows over that dam, and convey it to the defendants' mills. When the wing dam was made, a low place or gap was left in it about seven inches below the general level of the dam, for the purpose of deepening the current at that place and drawing off the ice, drift-wood, &c. from the guard-gates. The defendants' dam, extending out below and beyond the low place, and being about seven inches higher, set back the water upon it, and kept the water nearly at a level with the higher parts of the wing dam. In February, 1835, the defendants cut down their dam to a level with the low place in the wing dam. The master found that the defendants' dam and penstock interfered with the common works, and that it was practically injurious to the plaintiffs.

Exceptions were filed to the master's report.

The cause was argued several times and at great length, and opinions were expressed by the Court in different stages of the proceedings.

*J. Davis*, (of Worcester,) *Wells*, *G. Bliss*, and *Alvord*, for the plaintiffs.

Bardwell
v.
Ames.

*Bates, Rand,* (of Boston,) *Dewey, Bowdoin* and *W. Bliss* for the defendants.

At September term 1839, the following opinion of the Court was delivered by

SHAW C. J. Considerable difficulty, we apprehend, has arisen in the present case, by reason of introducing many questions, both of fact and of law, into the evidence and argument, which are not necessarily embraced in the questions put in issue by the pleadings. The consequence of this course was, that when certain opinions of the Court, in their nature preliminary, were given, and the cause was then referred to a master, the reference embraced matters which properly ought not to have been included in it. Instead therefore of following the course which has been pursued by the parties, of taking up the report and all the exceptions upon both sides, the Court propose now to restate the opinions formerly given, upon several of the most material points in the cause ; and as most of the matters embraced in the exceptions, may be passed over as not properly before the Court, especially all those relating to the claim of damages made by the plaintiffs Howard & Lathrop, we think the cause may now be finally disposed of, without going into those questions.

In the course now adopted, the Court, for reasons which have heretofore been assigned from time to time by several interlocutory opinions, consider that it is not necessary in this cause, to put a construction upon Bardwell's deed to the Ameses, upon the point whether the reservations of sufficiency of water to work the grantor's own mills, were first to be satisfied, or whether the full quantity intended to be granted should be first satisfied, in case there should not be enough to satisfy both, since, from the report which has now come in, it does not appear that the case has yet happened when there was not enough to satisfy both. As that question must depend upon the language of the deed taken in connexion with the subject matter upon which it is to operate, a full and exact knowledge of the mills and of the stream, at the time the deed was made, is essential to the proper decision of that question. The Court will therefore consider that question as entirely open, and unaffected by any opinion before pronounced, to be considered

and decided upon its merits, when it properly arises. We shall proceed to recapitulate those parts of the former opinions, with some slight modifications, which affect many of the most material questions in the present cause, omitting altogether the question of construction already alluded to.

The Court, at an early stage, felt some difficulty, arising from the fact, that though Josiah Bardwell and Howard & Lathrop are joint plaintiffs in this suit, yet their titles are not joint, and in some respects their rights are not joint, and in some respects, perhaps, it may appear that Howard & Lathrop might assert rights and claims falling within this general subject of controversy, against these defendants, which Bardwell could not do. And so, on the other hand, the defendants would have some answers to make against Bardwell, which would not be applicable to the claims of Howard & Lathrop. But as the substantial ground of complaint is common to the plaintiffs, as they are all mill owners below, complaining of injuries done to their common rights by the defendants, as the rights are all so intimately connected, both by the proximity of their works and their common origin of title, that if a suit had been brought by Howard & Lathrop it would have been necessary or proper to make Bardwell a defendant, we shall perhaps experience no inconvenience from permitting the plaintiffs to unite in their suit as plaintiffs.

No question, I believe, is raised in the pleadings, upon the jurisdiction of the Court, as a court of equity, though such an objection was taken in argument by one of the defendants' counsel.

The complainants set forth, that they are mill owners ; that as annexed to their mills they have certain definite rights and privileges in the flow of the water in certain quantities to and from their respective mills, and that the defendants have certain definite rights in the same stream ; and that the defendants have disturbed them in the enjoyment of their rights, both in diverting the water and in unlawfully flooding their mills with an excess of water beyond their rights. The case thus stated is, in legal contemplation, a *nuisance*, and thus it is brought within that branch of the statute, which gives this Court jurisdiction in equity in all cases of *nuisance*. And upon the question,

whether the plaintiffs have a plain, adequate and complete rem·edy at law, the Court are of opinion that they have not. This we think is manifest from the nature of the case as stated, because the proceedings in equity are necessary both to a proper discovery and to a proper and effectual remedy. Indeed it appears to us, that the proceeding in equity is peculiarly fitted to ascertain, settle and adjust the relative rights and obligations of parties so situated and to secure and enforce them, and that an action at law, which could only look to the past and inquire into damages actually sustained, and for these could only award a sum of money, without protection of the right for the future, would be neither adequate in its nature, nor complete in its effect.

Perhaps, instead of considering in the first instance the particular subjects of complaint in the order in which they are set forth in the bill, and inquiring whether they are or not, and to what extent, well founded, it may be more convenient to examine the relative rights of the parties, and the principles of law and the conventional acts upon which they are founded.

All the mill works and water privileges in question, lie upon the north shore of Connecticut river, near the foot of South Hadley falls, and are all supplied with water by a wing dam and artificial works, by which a portion of the vast flood of water, at that point, is turned in towards the shore, and brought to act upon these extensive works. It is admitted on all hands, and the arguments in the present case all proceed upon the uncontested principle, that upon a river like this, the owner of the shore, or the proprietor of the land bounding on the river, generally, is the owner of the soil to the central line of the stream, commonly called the *filum aquæ* or thread of the stream ; and that such an owner, like every other owner of land over which there is a stream of water, has a right to appropriate to himself, and apply to any useful and beneficial purpose, the force to be derived from the natural flow of the water, as it passes over his land, subject only to this limitation, that he does not thereby injuriously affect the common and equal rights of other proprietors of lands above or below his own, on the same stream. It is admitted that Josiah Bardwell was at one time the owner of the land on the north bank of the

river, to an extent above and below the limits of all the mills and privileges in controversy, and that as such owner, his right extended to the middle of the stream, by a line parallel to the shore on which his land lies.   Such an owner is conveniently enough designated by the significant appellation of *riparian* proprietor, of which term I shall avail myself in the discussion.   By this designation I understand, an owner of land, bounded generally upon a stream of water, and as such having a qualified property in the soil to the thread of the stream, with the privileges annexed thereto by law.

But it is manifest, that though such is the general right of the riparian proprietor, yet it is in his power, as such owner, to convey away his land without water privileges, that is, the upland without any part of the bed of the river, or the latter without the former, or to combine and parcel them out, in any manner which he may see fit.

It appears that prior to 1826, several parcels of the land in question, with qualified water privileges, had been conveyed by Bardwell or his ancestors, to Newell, to Oliver Chapin and others ; but it seems to us, that it will be quite useless to examine the nature or extent of the rights thus granted, because, whatever they were, they were expressly surrendered to Bardwell, by their respective proprietors, by the indenture of '1826, and that for the express purpose of vesting the whole in Bardwell, in order that a more precise and exact distribution and partition of these rights might be effected, by his grants and reservations, according to the mutual agreement of all the parties interested in them.   We think therefore, that from that time, all the parties to that indenture must found and derive their rights from the terms and provisions of that indenture, so far as those rights are claimed in the subject matter of that contract.   But it is of importance to consider what that subject matter was ; and we think it was the whole of the water power and mill privilege, created and established by the artificial works then erected for the purpose of appropriating and applying the current of the stream to mill purposes, consisting of the wing dam, the side dam, the guard-gates, the pond, reservoir or general passage, above the mills, and the stone flume.   This, we think, was the subject matter of this inden-

ture, and from and after the execution of it, all the rights of Bardwell, as well as of his grantees, in all the water privilege which was derived or could be derived by any mode of using *these works,* depended upon the indenture ; any rights which Bardwell had in the unoccupied portion of the river, as riparian proprietor, so far as they could exist, or could be used and occupied without impairing the conventional rights granted by the indenture, remained to him as ungranted, in the same manner as if the indenture had not been made.

It is also manifest, that this indenture effected an entire and complete partition, distribution and apportionment of this entire mill privilege, measured out by a rule, which seems by the parties to have been considered sufficiently accurate, for the practical purposes intended.   Had there been a mere grant by Bardwell of the specific quantity mentioned, to the other parties, without any further provision, it might well have been argued, that the reservation by Bardwell to himself was nugatory and void, because all not granted would of course be reserved to himself.   But such is not the frame of this indenture.  Bardwell first grants to Enoch Chapin and wife, (whose estate has since been acquired by the plaintiffs Howard & Lathrop,) a given quantity of water, such as will flow through four gates of specific dimensions and head of water ; then to Howard & Lathrop, Willard and Stephenson, (since also acquired by Howard & Lathrop solely,) a quantity of water which will flow through five gates of specific dimensions and head of water ; he then reserves to himself a quantity of water which will flow through twelve gates, of specific dimensions and head of water ; also, for a lower privilege not then nor yet occupied, a quantity equal but not exceeding that granted to Howard & Lathrop, Willard and Stephenson, by the same instrument. Then, after various stipulations and covenants, it is provided, that if at any time there shall be a deficiency of water, the parties shall be entitled to draw the same only in proportion to the rights and interests above expressed, that is, to the rights granted and to those reserved respectively, and in case there shall be a surplus, they shall all be entitled to use the same ratio or proportion.   It is elsewhere provided, that until the lower privilege shall be occupied, the whole stream shall be

apportioned among the three privileges, in the ratio established     <span>Bardwell<br>v.<br>Ames.</span>
by the admeasurements of the gateways, and afterwards it is to
be apportioned in like manner among the four privileges.    It
is obvious from this view, that by means of these grants, res-
ervations and covenants, the whole of this mill power and priv-
ilege as created by the works then erected, was embraced ; and
that the admeasurements specified in the indenture, by the size
and shape of the apertures and head of water, did not consti-
tute and determine the extent of the rights of the parties or
either of them, but served to form a rule of apportionment, by
which the whole power, whether it should exceed or fall short
of the aggregate of all the powers particularly specified in the
grants and reservations, should be divided and apportioned.
These rights being all derived from the same source, at the
same time, by an act to which all interested were parties, must
be considered as precisely equal ; and neither can claim any
advantage over the other, by prescription, usage, prior occu-
pancy, location or otherwise.

One other view it seems proper to take here of this inden-
ture, as it will embrace some of the questions raised by the
parties.    In each case, although certain specified gates of given
dimensions and head of water are mentioned as then in use,
this is obviously done to specify the quantity of water, and not
to limit the parties to the use of the same gates, or to the use
of so much water or water power for the same works ; but, on
the contrary, it is expressly provided, that the water may be
applied to any other works, and drawn through any other gates
of like capacity.    In the grant to Chapin and wife, it is "of a
privilege of drawing and using, for the benefit of the oil-mill, or
such other mill, works or machinery as may be erected or
used upon the site thereof, from the pond and flumes as now
erected and in use, so much water as may pass through the
(four) gateways now used in said oil-mill, or others of equal
capacity, (that is, such as will admit water of equal power,)
viz." &c.    The same phraseology is used in the grant to How-
ard & Lathrop, Willard and Stephenson ; it is for the benefit
of the paper-mill, or such other mill, works or machinery as
may be erected or used upon the site thereof, and through
gateways (described) now used in such paper mill, or others

of equal capacity. It will be recollected, that in both these cases, the sites of the oil-mill and the paper-mill were fixed by previous grants of the land on which they stood. But as Bardwell owned all the land above the oil-mill, in the reservation to himself there is still greater latitude, the water being reserved for the benefit of his mills, works and machinery *near* said pond, or others which may be erected on the same site or *near the same ;* the water to be taken through the gateways (described) now in use by said party on the premises or others of equal capacity. The only restriction in this case is, that the water of three of the twelve gateways, or an equivalent, is to be drawn from the pond without the stone flume, and that of the other nine is to be drawn from the stone flume.

From this view of the subject, it appears to us that the parties did not intend to restrict themselves or each other, to any species of mill work, or to any location of gates. It would have been contrary to the interests of themselves and of the public, in restraint of enterprise and improvement, if they had done so. They expressly reserved to themselves, as separate proprietors, the right of applying this power to such objects as they and their successors should, from time to time, deem most beneficial ; and for this purpose, of erecting such buildings and placing wheels in such positions, as should be best adapted to the structure of their works, limited by nothing but the quantity of water which each might draw from the common fountain. This water is in terms to be taken from the pond and flume as then erected and in use. It is a general rule of construction, applicable to all grants, and certainly not less applicable to mutual grants, that the right to enjoy a certain privilege draws after it a right to the use of all the means necessarily incident to the beneficial enjoyment of that privilege. We are all of opinion, that the right to erect new buildings and machinery, and the right of placing wheels and gates adapted to the action of such machinery, necessarily draw after them, as an incident, the right to make new flumes and openings into the pond and main flume, for the purpose of drawing the quantity of water to which the party is entitled, and applying it most beneficially to his works. Such new openings, therefore, into the old dam and flume, so far as they are necessary and

convenient to adapt the power to new works which the party has a right to erect, and secured by flumes and other works of proper strength and character to prevent waste of water or danger to the common works, are not a violation of the rights of the other parties.

It has been strongly argued, that this construction is opposed by that clause in the indenture, which provides that the dam, pier, guard-gates, stone flume, and the general passage for the water into that flume, shall be and remain situated as they now are, forever, unless altered by mutual consent of the parties, and be occupied in common for the purpose of obtaining water and making repairs, without interruption or hindrance from any party. But we think, that making openings into the dam or flume, in order to take water for mill purposes, is not an *alteration* of them, within the meaning of this provision. The main object of this stipulation was to provide, that the position, location and character of these common works, in which the parties had a common interest, should not be changed without the mutual consent of all. But the other parties have no interest in the question, where each shall take his allowed apportionment of water, if he does not exceed the quantity or injure the common works. Besides, every part of the instrument must be taken into consideration, in construing a particular provision, and must be so construed as to give to each its intended effect. Here there is an express provision, that each proprietor may take his appropriate share of the water from the common reservoir, by the gates specified or others of equal capacity. But no other can be used without an opening into some of the common works, the pond or flume. It must therefore have been considered, that such an opening was not an alteration of the common works, as the parties understood it.

If it be contended, that such new openings will weaken the dam or flume, it may be observed that this would be a violation of the covenant that the dam &c. shall be and remain, &c. and therefore such openings into them can be made only on the terms of making them equally strong and efficacious, for the general purposes intended, as they were before such openings were made. Or if it be insisted, that it may subject the other parties to expenses, we think the objection is answered by a

provision in the indenture, that the lesser flumes or passages, which conduct water from the main flume to the wheels of the several establishments, are to be supported by the respective owners of the wheels. And this duty is enforced by the general covenant at the close, that each of the parties will well and truly do, permit and suffer all and every thing in and by the foregoing on the part of each mutually and respectively to be done, permitted and suffered.

We may now proceed to consider the conveyance by Bardwell to the defendants, and the rights which they derived under it. It is manifest that Bardwell had no power to make any conveyance, which would infringe upon the conventional rights of the other parties as fixed by the indenture ; and by expressly reserving in terms, all the rights so conveyed to them, it is quite evident that he did not intend or attempt to make any such conveyance, and by inserting this reservation in the deed to the defendants, with an express reference to the indenture, as the authoritative measure of the rights thus granted, he intended that express notice of the existence and reservation of those rights, should accompany his grant, both to the defendants and to all those who might take derivative titles from them. By this reference to the indenture as the basis of this conveyance, the defendants are presumed conclusively to have notice of all its terms and provisions.

The question then is, considering what interest and power Bardwell had in the subject matter, and the legal effect of the terms and provisions of his deed, what interest or title passed thereby to the defendants. The grant was of a large tract of land, on a line four feet west of Bardwell's grist-mill, running northerly to the land of the proprietors of the locks and canals, that is, to some distance up the north bank of the river, then along the line of the land of those proprietors and near the bank of the canal westerly about sixteen rods, thence southerly to the middle of Connecticut river, thence down the river till it intersects the first mentioned line. This tract embraces a large part of the land held by Bardwell at the date of the indenture, including the saw-mill site, and extends far enough up stream to include all the dams and artificial works, which constituted the subject of settlement, and off towards the middle

of the stream, so as to include a considerable portion of the bed of the river, without and beyond the artificial works. So far as Bardwell, after the execution of the indenture, retained rights without and beyond the wing-dam and artificial works, as riparian proprietor, all those rights passed to the defendants. But it must be recollected, that as to the whole and entire right of Bardwell in the appropriated water power and artificial works, it had ceased to be local and had become exclusively conventional, to be sought for in the indenture. Accordingly the water power intended to accompany this grant of land, was not understood by the parties to be incidental to the grant of land, but was the subject of a special grant thus expressed :—" Also the right and privilege of drawing and using, for the benefit of a paper-mill, or such other mill, works or machinery as may be erected or used upon the above-granted premises, so much water from the mill pond on said river upon and above the premises, as is equal to the quantity and power to which Wells Lathrop, Eli Stephenson, Charles Howard and Daniel W. Willard, or their assigns, are entitled by virtue of" the conveyance of the 26th of July, 1826, or any other conveyance from Bardwell to them or their assigns, " a part of such water, not exceeding one half, to be drawn from the stone flume, and the residue thereof from the pond above said flume."

One of the principal difficulties in the case, I may say, speaking for myself, has been in putting a satisfactory construction upon this clause of the grant, and in ascertaining the extent of the water power intended to be conveyed by this clause in the deed.

One of the fundamental rules of construction is, to ascertain what the parties intended by the language they have used, and to carry that intent into effect, so far as it can be done con sistently with the rules of law and other provisions of the in strument ; and another rule of equal importance is, to look into every clause and provision of the whole instrument, in order, if possible, to ascertain that meaning, where the words are doubtful.

The difficulty may be thus stated ; and it arises, not from any thing apparent in the deed itself, or the indenture to which it refers, but to evidence *aliunde*.  The works in question stand

upon one continuous line, on land sloping downwards, from the upper mills to the lower, in the course of the stream. The consequence is, that the head and fall, or the distance from the surface of the water above the dam to the bottom of the raceway, where the water strikes after it has passed the wheels on which it operates, is somewhat greater at the lower than at the upper mill on the stream. It is in evidence from persons skilled in this subject, that the effective power of water upon machinery does not depend solely upon the dimensions of the aperture or gateway through which it is drawn, and the height of the column or head of water under which it is drawn, but that it also depends upon the greater or less fall of the water from the gateway, on or through the wheels, to the ground or bottom of the raceway upon which it falls. As the defendants' works are the highest on the stream, and of course have less fall from the gateway than those of Howard & Lathrop, which are the lowest yet erected on the stream, it is contended by the defendants, that in order to obtain an equal effective power, for mill work with that of Howard & Lathrop, they must have as much larger a quantity of water as will compensate for the difference of fall. On the contrary, it is contended by the plaintiffs, that this difference of local position and the consequent difference of fall, was not contemplated by the parties ; but that by referring to a description of the privilege granted to Howard & Lathrop by the indenture as the measure and limit of Bardwell's grant to the defendants, the parties intended the same thing as if that description had been inserted in terms in the deed, and in that case it would have been governed by the number and dimensions of the gateways, under the respective heads of water, as therein expressed, without reference to any other element of calculation.

Upon the best consideration which we have been able to give the subject, the Court are of opinion that the latter is the true construction, and that the parties intended that the quantity of water power conveyed should be determined by the apertures and head of water, without regard to the consideration of more or less fall of the water from the aperture to the bottom of the race.

It perhaps will not be easy, within a short compass, to set

forth all the considerations which have led the Court to this conclusion ; and in giving their opinion I must content myself with stating a few of the most prominent of those reasons.

The description is, so much water as is equal to the quantity and power to which Howard & Lathrop, Willard and Stephenson are entitled by the indenture or by any other conveyance. Now as no other conveyance is shown or suggested, it is the indenture alone to which this deed refers. In looking into the indenture, it appears to us manifest, that the elements intended to be referred to in measuring and apportioning the water power, were the dimensions of the apertures and the head of water, under which they were respectively drawn. It appears from the evidence, that these elements being given, there is an easy rule for ascertaining the quantity of water flowing in given times, and thus these elements are easily referred to a common measure, that of quantity, by which one such gate can be compared with another. Such comparison was an important object in framing that indenture, and if the indenture itself did not afford the means of making it, it would fail of its leading object, that of dividing out and apportioning the whole power, and its provisions would be nugatory. If any other element of computation was intended to be referred to, it must have been expressed. And it must be considered, that there was the same difference of fall, between the saw-mill site and Howard & Lathrop's paper-mill, in the indenture, as between the defendants' paper-mill and the same works of Howard & Lathrop. Perhaps one reason for overlooking this difference of fall, might arise from the fact, as disclosed in the evidence, that the wheels of the lower mills, in times of high water, were more liable to be flooded by back water from the river, than those of the mills higher up, which would in some measure counterbalance the advantage of greater fall. It may also be considered, that the question of quantity was the one in which they were mutually interested to restrict each other. But whatever may have been the motives of the parties, we think it clear from all the terms of the instrument to which they were parties, that this was the mode of admeasurement and apportionment, to which they meant to refer. The first instance of reference to any standard of measurement, is in the

grant to Chapin and wife, which is of "so much water as may pass through the following gateways, now used, or others of equal capacity, (that is, such as will admit water of equal power,) viz." &c. and then it proceeds to enumerate four gates, giving the length of each, and the height, and the head of water, from the top of the flume to the bottom of the gateway. Here, we think, the words in the parenthesis were intended to put a construction upon the word capacity. In its natural meaning, the word "capacity" might be understood to mean dimensions; but we think the explanation was intended to indicate, that capacity of gateway for mill purposes, did not include dimensions alone, but also head of water, which would give the velocity and thus afford a means of comparing one gateway with another, by reducing both to a common measure, that of quantity. At all events, "water of equal power" did not include any computation of fall, because these gates were all to be taken on the same site, which was a small one, and between one part of which and another there was probably no perceptible difference of fall.

The next instance is in the grant to Howard & Lathrop, Willard and Stephenson, in which it is described as "the right of drawing and using so much water, as may pass through the following gateways, now used, *or others of equal capacity.*" Here the gates are described by length, height, and head of water, without reference or allusion to any other element of computation. And it may be remarked in passing, that this is the specific description referred to in the deed of Bardwell to the defendants, as the measure of the right conveyed to them.

In the reservation by Bardwell of his own rights, in the indenture, the description is the same, the right and privilege of drawing and using so much water as may pass through certain gateways of specified length, height, and head of water, or others of equal capacity. So in the reservation of the lower privilege, it is provided that the water to be drawn out and used, shall not exceed in quantity, but may be equal to, that which the party of the third part (Howard & Lathrop, Willard and Stephenson) are entitled to by the indenture. Can it be doubted that the mode of ascertaining this quantity is by reference

to the standard given, viz. dimensions of gateway and head of water ?

But it appears to us, that there are other provisions in this instrument which strengthen this conclusion. There is an agreement that the expenses of keeping up and maintaining the dam and other common works, (exclusive of the stone flume, in which all did not equally participate,) shall be borne by the parties, in proportion to the water power which they respectively derive therefrom, *the proportion to be determined by the capacities of the gateways.* Here they seem expressly to have put a construction upon the term *water power*, as intended to be used by them. They had already put a construction upon the *capacity*, considering it to mean dimensions of aperture and head of water combined, and here they declare, that water power is to be determined by capacities of gateways.

Now it appears to us, that when the parties to Bardwell's deed to the defendants, instead of specifying the right intended to be conveyed, describe it in general terms, as a right equal to that granted in another instrument referred to, when we go to that instrument we take it not merely for the terms in which the right is expressed, but we must resort to the same standard of admeasurement as we find adopted in the instrument referred to, unless there is something in the deed itself to qualify or limit this application.

But we think there is something in the deed from Bardwell to the defendants, to countenance the same conclusion. The grant is, of so much water as is equal to the quantity and power to which Howard & Lathrop, Willard and Stephenson are entitled by the indenture. The difficulty is in applying the terms " quantity and power." The argument of the defendants assumes, that the same quantity will not give the same power, and therefore no construction will satisfy both terms. If the quantity is the same, the power is different ; so if the power is the same, the quantity must be different. It may be perhaps contended, that if they cannot be reconciled, the words are to be taken most strongly against the grantor, and that the grantee may take by that which will be most beneficial. But this is a rule founded on the assumption, that it does not carry into effect the intention of the parties, and is only to be

Bardwell
*v.*
Ames.

applied in the last resort, when all attempts to ascertain the intent of the parties have failed.

By this deed the defendants were let into a participation of common privileges, and made subject to common duties, not only with their grantor, but with others. There is a stipulation, that this grant is made on condition that the grantees and their assigns shall contribute towards the expenses of the dam and other common works for the general use, in proportion to the water power which they derive therefrom, compared with the other owners thereof. This refers directly to the indenture, to fix these proportions. But by the indenture the parties had fixed the ratio of contribution, in the same manner, to be according to the water power they respectively derive therefrom, but they therein proceed to explain what they mean by this term, by adding " the proportions to be determined by the. capacities of the gateways." Here then by the terms of their deed they are to contribute with others to certain expenses, in proportion to their water power. The ratio of the contributions of those others, is fixed by a definite rule ; are these new participators to contribute according to their water power, to be measured by another and different rule ? No such rule is laid down ; no means given for settling a common measure, or means of comparison of these different powers, except dimensions of gateways combined with head of water, and no intimation that any such different rule was in contemplation. We think therefore that they referred to the indenture, as the means of adjusting the ratio of contribution, and that it is to be resorted to as well to furnish the rule and standard of power, as the rate of contribution. It is observable, that in the words of grant, it is not a quantity of water which will afford a power equal to that of Howard & Lathrop, but *so much water as is equal to the quantity or power*, &c. Strictly speaking, so much water cannot be equal to a power. It requires explanation and exposition. What is the true one ? We think both terms were used for greater caution, and that the term *power* was intended to be used, not in a vague and indefinite sense, but in the sense put upon it by the indenture, to which the parties referred throughout, " the proportion (of power) to be determined by the capacities of the gateways." On the whole,

taking the two instruments together to ascertain the meaning and intent of the parties, we are all of opinion, that by this grant, Bardwell conveyed to the defendants a water privilege equal to that conveyed by the indenture to Howard & Lathrop, Willard and Stephenson, to be determined by the number and dimensions of the gateways, and the head of water under which they are drawn, without regard to the difference of the fall below those gateways, arising from the difference of the position of the relative works on the stream, and that the defendants have no lawful right, by their conveyance from the plaintiff Bardwell, to take an increased quantity of water in consequence of such difference of fall.

One other point of construction arises upon this deed. It provides, after the grant of the described water power, that a part of such water, not exceeding one half, is to be drawn from the stone flume, and the residue thereof from the pond above said flume. Upon the construction of this clause, and as between the defendants and the plaintiff Bardwell, the Court are of opinion that the defendants' construction is correct, and that they have a lawful right to take any quantity of the granted water power, less than one half, from the stone flume, and may take the residue, being any portion short of the whole, from the pond. But as between Bardwell and the other plaintiffs, there is a restriction upon Bardwell's own power, contained in the indenture, which may or may not restrict the defendants' right to draw from the pond.

In that part of the indenture which carves out Bardwell's own right, for twelve gates, of specified dimensions and head of water, it is provided, that three gates (described) or an equivalent, are to be drawn from the pond without the stone flume, the others to be drawn from the flume. Here we think no option was left. Whatever may have been the motives of the parties, in making this provision, we think they had a right to make it, it was made in plain and explicit terms, and the other parties have a right to insist on it. Bardwell and the defendants together, as against the other plaintiffs, Howard & Lathrop, now hold the rights which Bardwell originally held under the indenture, but no more. Bardwell had a right to convey to the defendants his whole right to draw from the

pond, reserving all his own power to be drawn from the flume. If therefore the quantity drawn by the defendants from the pond, exceeds the quantity which Bardwell had a right to draw thence by his three gates, including as it did the great saw-mill gate, then the defendants, although they have a good right so to draw as against Bardwell, have no such right as against Howard & Lathrop, because they cannot take what their grantor had no power to convey, and therefore they must be restrained to the quantity expressed by those three gates ; but if the quantity thus taken from the pond does not exceed the quantity which Bardwell had a right to draw thence by his three gates, then the defendants do not in this respect exceed their lawful right or infringe the rights of the plaintiffs.

Having thus endeavoured to ascertain the rights of the parties, by ascending to the sources of them, it only remains to see how the particular complaints of infringement, made in the present case, are sustained.

1. As to the charge of making new openings into the pond, the Court are of opinion, that the making of the thirteen feet opening in the old dam by the defendants, was not a violation of the provisions of the indenture ; that they were not obliged to take the water at the same place at which it was taken by the old saw-mill flume, but they had a right to take the same quantity by those or other gates of equal capacity ; that the provision in the deed of Bardwell to the defendants, that they should not take more than half the stipulated quantity from the stone flume, left them at liberty to take more than half from the pond, and unless the quantity thus taken exceeds the quantity which by the indenture Bardwell had a right to take from the pond by his three gates, that opening by the defendants into the pond is not an infringement of the plaintiffs' rights ; that the general provision in the indenture, that no alteration should be made in the wing-dam, guard-gates and general passage, without mutual consent, does not restrain the parties from making such openings into the dam and stone flume, as might be necessary to enable them to enjoy their respective rights of water in the most convenient manner, but that that covenant had another and distinct object, to secure to all the parties the preservation, security and identity of the common works.    Nor

does the fact, that the defendants take the water in a more direct line with the current, make any difference, because the quantity of water which they have a right to draw, does not depend upon and cannot be measured by the capacity or direction of the opening from the common reservoir to the private flumes, but by the capacity of the gates and the head of water above them, by which the water is drawn from those flumes to the wheels.

2. If the defendants have erected works and opened gateways, in their private flumes, capable of taking a much larger quantity of water than they have a right to draw, the Court are of opinion, that it would be contrary to equity thus to erect works and open gates therein which would be capable, in their ordinary action, of drawing a much larger quantity of water than they have a right to take from the common reservoir, especially when those gates are under and within their own mill and withdrawn from observation ; and that equity would award an injunction against the opening of such gates, and require the defendants permanently to close a portion of them, leaving such only as would enable the defendants to draw the quantity to which they are entitled. The natural presumption is, when gates are placed in a mill which may all be used at once, that it is the intention of the owner at some time so to use them, and therefore if the defendants have works of such a peculiar character as to require the alternate action of particular gates, so that when one is open, a corresponding one is necessarily closed, this is out of the usual course of things, and in order to obtain the right to open a greater capacity of gates than it is intended at any one time to use, it is incumbent upon the defendants to set out such special case, and to give such pledge or security as may be devised and adapted to the case, so as effectually to protect the rights of the other parties.

But in order to determine what the extent of the defendants' rights is, it is necessary to resort to the indenture. The grant by Bardwell to D. and J. Ames, is of a right of using so much water as is equal to the quantity and power to which Lathrop, Stephenson, Howard and Willard are entitled by the indenture. In determining what this water power is, according to the views before taken, we are not to take the given number and

dimensions of gates, and head of water, mentioned in the indenture, as the measure of the power assigned in the partition to Howard & Lathrop, Willard and Stephenson, but such a proportion of the whole water power of the stream, as the power expressed by their gates bears to that expressed by all the gateways mentioned in the indenture, including those granted to Chapin and wife, Howard & Lathrop, and Willard and Stephenson, and those reserved by Bardwell for himself. By the indenture the rights of the defendants will be larger, until Bardwell shall occupy his lower privilege, and when that privilege is occupied, they must be in a corresponding manner reduced. By the indenture, Bardwell, for his lower privilege not yet occupied, has a right to a quantity of water equal to that assigned by the indenture to the party of the third part, that is, to Howard & Lathrop, Willard and Stephenson. But until Bardwell shall use his lower privilege, the parties have a right to divide the whole stream in the proportion of the quantity of water expressed by the gateways of the parties, granted and reserved in the indenture, without regard to the lower privilege Laying that lower privilege out of the case for the present, the mode of ascertaining the extent of the defendants' right, is this.

First consider what quantity of water would be discharged by the gateways, including head of water, reserved to Bardwell ; — Second, the quantity to be discharged by the gateways assigned and granted to Chapin and wife ; — Third, the quantity to be discharged by the gateways assigned and granted to Howard & Lathrop, Willard and Stephenson ; — and consider these as the aggregate ; which, for the purpose of computation, may be called 100.

Suppose Bardwell's quantity, thus measured by his gateways and head of water, to be in proportion to the whole as 59 to 100, he is put down . . . 59

Suppose Chapin and wife's, measured in the same way, to be $\frac{12}{100}$ . . . . . . 12

Howard & Lathrop, Willard and Stephenson's, . 29

_____

100

Then the course would be, to ascertain the whole available quantity of water afforded by the stream for mill purposes, and

the share of the defendants, under their grant from Bardwell, <span>Bardwell</span>
in the case supposed, would be twenty-nine one-hundredth <span>v.</span>
parts of the whole available quantity afforded by the wing-dam, <span>Ames.</span>
stone flume and artificial works.

After Bardwell uses his lower privilege, being a quantity
equal to Howard & Lathrop, Willard and Stephenson's share,
another proportion must be established. If that quantity may
be expressed, following the illustration already assumed, by
29, then the power to be distributed must be divided into 129
parts, and the defendants' proportion under his grant would be
29 one hundred and twenty-ninth parts of the whole quantity
afforded by the stream.

But as it has not been satisfactorily shown by the evidence,
that the defendants have drawn a greater quantity of water from
the common reservoir than they would have a right to do by
this computation, and as the defendants have disclaimed any
intention to take a larger quantity than they are entitled to, we
think it is sufficient now to declare the rights of the parties, as
we consider them, without ordering any injunction on the sub-
ject.

3. The Court are of opinion, as already expressed, that the
defendants, as the grantees of Bardwell and as riparian propri-
etors under that grant, acquired a property in the bed of the
river and in the stream without and beyond the wing-dam and
other artificial works of the proprietors of the mills, and, as
such riparian proprietors, might erect any works, and make any
use of the stream, which could be done without interfering
with the works of the proprietors of the mills, but that they
had no right, under this title, to alter or change these common
works in any respect. Therefore the Court are of opinion,
that the raising of the dam without and below the wing-dam,
seven inches, or any other quantity, higher than the wing-dam,
by the defendants, so as to throw back the water upon that
dam, is a change and alteration of that work, which the de-
fendants had no right to make, was a violation of the agreement
that the wing-dam and other common works should be and re-
main situated as they were unless altered by mutual consent,
and against the erection and maintenance of such dam, if it
causes any damage to the plaintiffs, they are entitled to relief

Bardwell
*v.*
Ames.

4. The Court are of opinion, that the entire right of the mill power and privilege, as created by the wing-dam and other common works, erected at the date of the indenture, was parcelled out and distributed among the parties and apportioned and adjusted by the indenture ; that this right extended to the use and enjoyment of the raceway then in use for conducting water *from* the mills, which thenceforth became a common and conventional right, regulated by the indenture, and that neither party could do any act to render that raceway less beneficial ; that although at that time this raceway was a part of the river, yet that when the defendants erected a wall on their own land, on the southerly side of their building, to keep out the waste water of the river, they had a right so to do, provided it did not injure or impair the rights of the other parties, and that when the plaintiffs continued this wall down the river, they had a right to do so, if it did not prejudice the other party, and that thenceforth the space between this wall and the shore became the common raceway of the parties, to be used in connexion with their respective water rights, as settled by the indenture.   Even if the plaintiffs, by their wall or other works, narrowed the raceway, as was contended by the defendants, we think that it would not justify an aggression on the part of the defendants ; that under these circumstances the defendants had no right to raise and maintain the penstock by which water is drawn into their mill and thence into the common raceway, whereby an additional quantity of water is thrown into the raceway, beyond what is or can be drawn from the common reservoir ; and that this is a violation of the rights of the plaintiffs, and a nuisance, against which the plaintiffs are entitled to an injunction.   We are also of opinion, that the introduction of this large quantity of water, by works erected without and below the common works of the ̄parties, would not be justified by the fact, if proved, that the defendants, by their wall, had kept as large a quantity of back water from the wheels of the other parties, as this new work was calculated to throw upon them.

It will, I presume, be understood, from what has been heretofore said, that this opinion does not affect the right of the defendants as riparian proprietors, to erect any penstock o

other works, if any can be erected, without and below the common works of the parties, to take the surplus water of the river, after it has flowed over or by the common works, the same not interfering with those common works, or the several mills and works of the parties, below them and connected with them.

The ground upon which the Court have come to the conclusion, that this cause could be decided without considering at large the matter of the master's report, and the various exceptions to it upon both sides, arises from a consideration before suggested, that much of that report and the matter of the controversy embraced in it, is not properly open upon the bill and answer as they now stand.  This is owing to no fault of the master, but to inadvertence and want of due precision in drawing up the rule under which the reference was had.  The question is, whether upon the pleadings as they now stand, the plaintiffs can claim any relief, either by way of injunction against future encroachments, or damage for any alleged past injury, whatever may be the construction of the deed from Bardwell to the defendants, and the rights of the grantees under it, founded on the assumption that the defendants had no right to draw water to the amount of 12,335 cubic feet per minute from the common reservoir.  The construction of Bardwell's deed, as contended for by the plaintiffs, and the evidence offered by them, assuming that construction, tends to show that the defendants have a right to draw only about 4000 or 5000 feet, and the damages claimed are founded upon the assumption, that this is so established.  But if this be so, in fact and in law, it is not the right and the infringement of it which they have set forth in their bill, and which is put in issue by the answer.  In this case, Howard & Lathrop and Bardwell are joint plaintiffs, setting out the same grievances and claiming the same relief.  This is not mentioned in reference to the question, whether in the same suit in equity one plaintiff can have a decree for one measure of damages and another for another or none, upon a bill properly framed with reference to such claims ; but in this bill both plaintiffs unite in the same averments and are bound by them.

By recurring to the bill, it appears that the gravamen of the

Bardwell<br>v<br>Ames.

complaint, as to this part of the case, is, that the defendants had derived from Bardwell a right to the use of water power from the common works, equal only to that of Howard & Lathrop at their mills as fixed by the indenture, or by any subsequent deed to them from Bardwell, and that the quantity to which they were thus entitled was equal to 12,335 cubic feet per minute and no more ; and that the defendants were about erecting and had begun to erect works which would require a much larger quantity than 12,335 cubic feet per minute, and that they threatened and intended to use a much larger quantity and to discharge it into the common raceway ; and the bill prays an injunction to prevent the defendants from drawing such larger quantity, over and above the quantity which they had a right to use, that is, over 12,335 feet.

Several other distinct subjects of complaint are embraced in the bill, viz. altering and changing the common works, by erecting the dam below the side dam, by cutting new openings into the common works, and by introducing a flood of water into the common raceway, from the river, by means of the penstock, to the great injury of the plaintiffs as proprietors.

To these several subjects, which are distinct from the question now under consideration, and which do not necessarily involve the construction of Bardwell's deed to the defendants, or the relative rights of the plaintiff Bardwell and the defendants as to the quantity of water to be drawn by them, respectively, from the common works, the attention of the Court has already been directed and an opinion expressed.

But as the bill avers, that the defendants had no right to take more than 12,335 cubic feet per minute, and an intention to take more, the answer applies to and traverses the averment in the bill, and therefore the matter put in issue is not whether the defendants have a right to take as much, but whether they have a right to take more. In truth, the defendants did insist by their answer, that they had a right under the deed to take a much larger quantity of water from the common works in cubic feet, than Howard & Lathrop, to compensate for Howard & Lathrop's greater fall, in order to give them an equal power. But they do by their answer deny that they have used

or intended to use a greater quantity than they are entitled to under their deed.

The matter put in issue by this part of the bill therefore is, whether the defendants had taken, or threatened or intended to take, from the common works, a greater quantity of water than 12,335 cubic feet per minute, and as it does not appear by the report, that they have taken more than the quantity stated, the Court are of opinion, that whatever may be the right proved before the master, the plaintiffs, on *these pleadings*, cannot have any decree for damages upon that ground, or for an injunction to restrain the defendants from taking any quantity not exceeding the 12,335 cubic feet per minute. As we understand the report, all the damages awarded by the master to Howard & Lathrop, are given for damages supposed to have been sustained by them, from the use by the defendants of a larger quantity of water than the master finds them entitled to, upon the principles adopted by him, which would be much under 12,335 feet, not exceeding 4000 or 5000 feet, or at least, we take this to be the main ground on which they are given. But as it appears, that upon these pleadings this claim of damage was not open, no decree for this damage can now be given.

In regard to these damages it may be proper to make another suggestion. When this bill was brought, the wrongs sought to be redressed were anticipated, not actually suffered. All the acts and torts for which damages were awarded, were done, it is believed, after the suit was commenced. It may be a question, whether damage in such case can be awarded without a supplemental bill, showing that the injury feared had been realized; but whether a supplemental bill, in point of form, would be necessary or not, is immaterial, because if a supplemental bill could be filed, it must follow the original complaint, and set forth actual and subsequent damages arising from the same cause set forth in the bill. That original cause of complaint was the drawing over 12,335 feet; the supplemental bill must be for the same substantive cause; therefore, for the reasons already given, such supplemental bill could not aid the plaintiffs to recover the damages reported by the master.